[Cite as *State v. McNamara*, 2016-Ohio-8050.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104168**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMES D. MCNAMARA

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600414-A

**BEFORE:**   Kilbane, P.J., Stewart, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   December 8, 2016

**ATTORNEY FOR APPELLANT**

Nathaniel Tosi
2639 Wooster Road
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Andrew J. Santoli
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

{¶1} Defendant-appellant, James McNamara ("McNamara"), was convicted of rape, kidnapping, illegal use of a minor in nudity-oriented material or performance, and possessing criminal tools. On appeal, he only challenges his convictions for illegal use of a minor in nudity-oriented material or performance and possessing criminal tools. For the reasons set forth below, we affirm.

{¶2} In October 2015, McNamara was charged in a 55-count indictment. Counts 1, 3, 5, and 7 charged him with the rape of his minor stepdaughter, J.R., d.o.b. April 8, 2000. Each of these counts carried a sexually violent predator specification. Counts 2, 4, 6, and 8 charged him with the kidnapping of J.R. and carried a furthermore clause that the victim was under 18 years of age. Counts 2 and 4 also carried a sexual motivation specification and a sexually violent predator specification. Counts 9-54 charged McNamara with the illegal use of a minor in nudity-oriented material or performance. Count 55 charged him with possessing criminal tools — the laptop computer from which the images were recovered.

{¶3} The matter proceeded to a bench trial in January 2016, at which the following evidence was adduced.

{¶4} G.R. is J.R.'s mother. G.R.'s husband, who is also the father of her three children, passed away in 2006. G.R. began dating McNamara in 2007, after she met him through online dating. McNamara moved into her home in June 2008. At that time, G.R. was living in Parma, Ohio with her daughter, J.R., and her sons, A.R. and N.R.

McNamara has two sons, D.M. and S.M. His younger son, S.M., moved with him to G.R.'s in 2008. McNamara and G.R. eventually married in 2010.

{¶5} J.R. testified that she viewed McNamara as a father figure. The two of them spent a lot of time together during the course of 2011, and she developed a close bond with McNamara. J.R. testified that in November 2011, while the two of them were watching television in the living room, McNamara coerced her to lay on him. He rubbed her arm for a short period of time and then proceeded to insert his finger into her vagina. She asked him to stop because it hurt. McNamara responded that he "was just trying to see how [she] was developing." J.R. was 11 years old at the time and did not understand McNamara's actions. She did not tell her mother because she questioned "whether [McNamara] was seeing whether [she] was developing and whether he was allowed to or not because [she] wasn't sure." McNamara would also touch J.R.'s breasts and her buttocks several times a week and tell her that she was "growing with her age." J.R. did not tell anyone about this because McNamara told her that he was allowed to see how she was developing.

{¶6} In February or March of 2012, McNamara again inserted his finger into J.R.'s vagina while they were on the couch in the living room and covered under a blanket. During this incident, McNamara penetrated her twice. McNamara told J.R. he wanted to see how she was developing, and not to tell her mother. In December 2013, J.R. and McNamara were in the basement sitting on the couch and covered with a blanket. McNamara was rubbing J.R.'s leg. He then slid his hand up her leg and inserted his

finger into her vagina. She told him that it hurt and asked him to stop. McNamara told her "[d]on't tell your mom. I'm just seeing how you're developing."

{¶7} J.R. explained that in December 2013 she began to realize that McNamara's actions were inappropriate. She did not tell anyone about McNamara's actions because she feared the effect her disclosure would have on her developmentally disabled stepbrother, S.M. Additionally, she stated that she was worried McNamara would hurt her if she said anything because McNamara was a controlling and intimidating person. Sometime after the December 2013 incident, J.R. confided in her best friend, M.C., about what McNamara had done to her. M.C. told her to share this with her mother, but J.R. hesitated to say anything.

{¶8} In September 2014, J.R. was lying on the couch again with McNamara in the basement. He was rubbing her legs and then slide his hand into her pants. He tried to insert his finger into J.R.'s vagina. However, J.R. did not allow it to happen. She stood up and told him she was going to bed. At this point, J.R. fully realized that McNamara's actions were inappropriate. That night she messaged K.G., her brother's friend, and told him what just happened with McNamara. A few days later, J.R. told her brother, A.R., about the sexual abuse committed by McNamara. Later that afternoon, J.R. decided to tell her mother that McNamara was sexually abusing her. J.R. felt safer to tell her mother about the sexual abuse at that time because McNamara was out of town on a business trip.

{¶9} J.R. further testified that McNamara took pictures of her in August and September 2014. He told her he was taking pictures of her to see how much muscle she gained during volleyball. J.R. was dressed in her sports bra and volleyball shorts while he took the pictures. The photographs depict J.R. flexing her arms, legs, abs, and back and her squatting. McNamara also took pictures of J.R.'s vagina while she was sleeping on her bed. The police showed J.R. these pictures after they obtained McNamara's cell phone. J.R. identified herself as the individual on the bed because she recognized the bracelets on her arm and her bed comforter.

{¶10} G.R. testified that she began to date McNamara in 2007, after her husband and the father of her children passed away. When McNamara moved into her home, he took over the father-figure role to all of her children. He was very involved in J.R.'s activities and regularly attended her sporting events and parent-teacher conferences at school. He was not as involved, however, in N.R. and A.R.'s lives. McNamara disciplined N.R. and A.R. frequently, yet rarely disciplined J.R. G.R. testified that McNamara had a tendency "to get mean" and recalled incidents where McNamara grabbed her by the neck and "knocked out" her son. G.R. further testified that McNamara disrupted her relationship with J.R. He would always try to get involved into her and J.R.'s conversations and told G.R. that she was a "lousy mother." She felt that McNamara treated J.R. more like his wife than her.

{¶11} When J.R. told G.R. about the sexual abuse, she took J.R. to the Parma Police Department to report that McNamara had sexually abused her. G.R. gave police

consent to search her home and consent to retrieve McNamara's laptop. After the police arrested McNamara, D.M., McNamara's older son, called G.R. and told her that he found something on McNamara's phone that made him upset. McNamara had given D.M. his cell phone prior to turning himself into the Parma police. D.M. then turned over McNamara's phone to the police after he found graphic pictures on McNamara's phone. G.R. was shown the images from McNamara's cell phone by Parma Police Detective David Sheridan ("Detective Sheridan"). The images were of J.R. lying on her bed, with an iPad on her chest and a graphic picture of her vagina.

{¶12} G.R. further testified that McNamara was very protective of his electronic devices and told her that his laptop was no one else's business. She never observed anyone else use the laptop, other than McNamara. J.R. also testified that McNamara was the only person permitted to use his laptop.

{¶13} M.C. is J.R.'s best friend. She met J.R. in fifth grade and they have been friends since then. When M.C. would spend time at J.R.'s house, she noticed that McNamara would pay special attention to J.R. M.C. also noticed that McNamara treated J.R. better than he treated G.R. In the summer of 2013, J.R. confided in M.C. that McNamara had been inappropriate with her. M.C. testified that J.R. seemed confused as to what had happened to her and did not seem sure how to tell M.C. At that time, M.C. did not tell anyone because J.R. told her not to and she did not fully understand the situation. Approximately one year later, J.R. talked to M.C. again about McNamara sexually abusing her. At this point, M.C. understood the situation better and could also

tell that J.R. understood the situation better. M.C. then told J.R. that she needed to tell her family.

{¶14} K.G. is J.R.'s close family friend. He testified that when he was at G.R.'s, he noticed that McNamara was more hostile toward N.R. and A.R., but was easier on J.R. and S.M. There were times when he was at G.R.'s house and felt as if McNamara was flirting with J.R. In early September 2014, he received a phone call from McNamara, asking him to come over because of the messages he read between K.G. and J.R. K.G., who was 17 years old at the time, testified that the messages were about his ex-girlfriend. McNamara was upset that K.G. and J.R., who was 14 years old at the time, were flirting, and told him that it better not happen again. He also told K.G., "I'll wrap your head around a pole." G.R. testified that McNamara was screaming at K.G. because he found a text from K.G. saying that J.R. was "hot and he wouldn't mind sleeping with her."

{¶15} Within the next day or two, J.R. messaged K.G. and told him that McNamara had been abusing her sexually and taking photos of her, but told K.G. not to tell anyone. K.G. told J.R. that she should tell her mother. At that point, K.G. felt uncomfortable with McNamara around J.R., so he told A.R., J.R.'s brother.

{¶16} D.M. is McNamara's older son. In September 2014, McNamara told him of the allegations made by J.R. D.M. accompanied McNamara to the Parma Police Department, where McNamara turned himself in. At that time, McNamara gave D.M. two cell phones for safekeeping. D.M. went through McNamara's cell phones and observed graphic photographs of J.R. D.M. testified that he immediately turned over the

cell phones to the Parma police. D.M. further testified about his observations of the relationship between McNamara and J.R. and thought it was inappropriate.

{¶17} Detective Sheridan was assigned to the case. He received a call from D.M. regarding graphic photographs on McNamara's cell phone. Detective Sheridan knew the graphic photographs on McNamara's cell phone were of J.R. because he recognized the distinct wristbands she was wearing. He showed the photographs to J.R. and G.R. to identify J.R. as the individual in the graphic photographs on McNamara's cell phone.

{¶18} Jeffrey Rice ("Investigator Rice") is an investigator with the Internet Crimes Against Children Task Force. He examined McNamara's laptop and cell phone. Investigator Rice bookmarked 37 images from McNamara's laptop that appeared to be of underage females. The images were not downloaded, but were viewed, which allowed McNamara's laptop to create the image on the computer hard drive. He also found webpages searched for preteen nude models on McNamara's laptop. At some point, McNamara's laptop was using a private mode of Internet Explorer to search multiple websites that Investigator Rice considered child pornographic searches. Investigator Rice stated that it was his expert opinion that the images were generated from someone either physically accessing the images on the specific webpage or just accessing the webpage, not from a virus scan or a popup.

{¶19} After the conclusion of trial, the court found McNamara guilty of Counts 1-10 and 33-55 and not guilty of Counts 11-32. The court also found McNamara to be a sexually violent predator as specified in Counts 1-5. At sentencing, both the state and

McNamara agreed to the merger of the following counts: (1) Counts 1 and 2 (rape and kidnapping), with the state electing to proceed with Count 1; (2) Counts 3 and 4 (rape and kidnapping), with the state electing to proceed with Count 3; (3) Counts 5 and 6 (rape and kidnapping), with the state electing to proceed with Count 5; and (4) Counts 7 and 8 (rape and kidnapping), with the state electing to proceed with Count 7. The trial court then sentenced McNamara to 25 years in prison to life on Count 1; 10 years to life on each of Counts 3, 5, and 7; 3 years on Count 9; 12 months on Count 10; and 6 months on each of Counts 33-55 (illegal use of a minor in nudity-oriented material or performance and possessing criminal tools). The court ordered that Counts 3, 5, and 7 be served concurrently for a total of 10 years to life and Counts 9, 10, and 33 through 55, be served concurrently for a total of 3 years. The court further ordered that Count 1 be served consecutive to Counts 3, 5, and 7 and Counts 1, 3, 5, and 7 be served consecutive to Counts 9, 10, and 33 through 55, for a total aggregate prison term of 38 years to life.

{¶20} McNamara now appeals, raising the following two assignments of error for our review.

Assignment of Error One

The state failed to present sufficient evidence of the offense charged.

Assignment of Error Two

[McNamara's] conviction is against the manifest weight of the evidence.

Sufficiency of the Evidence

**{¶21}** In the first assignment of error, McNamara argues there is insufficient evidence to support his illegal use of a minor in nudity-oriented material or performance (Counts 9-10 and 33-54) and possessing criminal tools (Count 55) convictions.[1] He contends the state failed to prove that he was the individual who searched for and downloaded nude images of underage females on the laptop, he was the individual who produced and possessed the image of J.R.'s vagina on his cell phone, and he used his laptop with a criminal purpose.

**{¶22}** The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d

---

[1]McNamara's entire argument focuses on the counts involving the illegal use of a minor in nudity-oriented material or performance and possessing criminal tools charges. He raises no argument as to the rape and kidnapping counts. Therefore, we need not address them.

259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶23}** We are mindful that, in considering the sufficiency of evidence, a certain perspective is required. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978). "This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.*, quoting *Atkins v. State*, 115 Ohio St. 542, 546, 155 N.E. 189 (1926). It is the minds of the trier of fact, rather than a reviewing court, that must be convinced. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

**{¶24}** In the instant case, McNamara was convicted of illegal use of minor in nudity-oriented material or performance in violation of R.C. 2907.323(A)(1) and (3), which provides that

(A)   No person shall do any of the following:

(1)   Photograph any minor who is not the person's child or ward in a state of nudity, or create, direct, produce, or transfer any material or performance that shows the minor in a state of nudity[.]

\* \* \*

(3) Possess or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity[.]

**{¶25}** He was also convicted of possessing criminal tools in violation of R.C. 2923.24(A), which provides that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."

{¶26} McNamara argues the state failed to prove that he downloaded the images on the laptop because it was accessible to any family member and it was not locked. He also argues the state failed to prove that he took the pictures of J.R. that were found on his cell phone. He further argues that by failing to prove that he was the person responsible for the images on the laptop, the state also failed to prove that he used his laptop with a criminal purpose. We disagree.

{¶27} We find the instant case analogous to *State v. Dyer*, 8th Dist. Cuyahoga No. 88202, 2007-Ohio-1704. In *Dyer*, the defendant was charged with illegal use of minor in nudity-oriented material or performance. He argued that there was no evidence to indicate he owned the computer containing the pornographic pictures. There was testimony, however, from the defendant's wife stating that she had observed Dyer viewing on his computer what appeared to be child pornography. *Id.* at ¶ 34. There were also 77 images of child pornography retrieved from the defendant's computer that the detective identified, with a reasonable degree of certainty, as minors. *Id.* In viewing the evidence in light most favorable to the prosecution, we held that there was sufficient evidence to support the defendant's convictions, and the defendant's convictions were not against the manifest weight of the evidence. *Id.*

{¶28} Likewise, the matter before us was proven by circumstantial evidence. We recognize that

[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of

proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, *following Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and *overruling State v. Kulig*, 37 Ohio St.2d 157, 309 N.E.2d 897 (1974). Circumstantial evidence does not need to be examined more closely than direct evidence. *State v. Wills*, 120 Ohio App.3d 320, 330, 697 N.E.2d 1072 (8th Dist.1997).

{¶29} In the instant case, just as in *Dyer*, there was no testimony that someone actually witnessed McNamara download nude images of underage girls onto his laptop or take the picture of J.R.'s vagina with his cell phone. However, the state did present evidence by Investigator Rice, an expert in the examination of forensic analysis of computers, that the nude images found on McNamara's hard drive were of underage girls. There was also testimony by J.R. and G.R. that McNamara was the only person permitted use to the laptop, and he was the only person ever seen using the laptop. G.R. testified that the laptop was specifically his, and no one else touched it because he was very protective over his electronic devices.

{¶30} Moreover, the police obtained graphic pictures of J.R.'s vagina on McNamara's cell phone. McNamara gave D.M. two cell phones for safekeeping when he was arrested. D.M. went through McNamara's cell phones and observed graphic

photographs of J.R. He turned McNamara's phone over to the police. The police found pictures of J.R. posing in her sports bra and volleyball shorts on McNamara's cell phone. These pictures depict J.R. flexing her arms, legs, abs, and back and her squatting. J.R. testified that McNamara took these pictures of her in August and September 2014 to see how much muscle she gained during volleyball. McNamara also took pictures of J.R.'s vagina while she was sleeping on her bed. J.R. identified herself as the individual on the bed because she recognized the bracelets on her arm and her bed comforter. G.R. identified J.R. because of the bed comforter and Detective Sheridan identified J.R. because of her bracelets.

{¶31} Based on the testimony provided, we find there was sufficient evidence presented that would allow the trier of fact to find McNamara downloaded, viewed, and possessed the nude images of underage girls on his laptop and took photos of J.R. on his cell phone. Having found sufficient evidence to support McNamara's convictions of the other counts, we also find sufficient evidence to support his possessing criminal tools conviction.

{¶32} Accordingly, the first assignment of error is overruled.

Manifest Weight of the Evidence

{¶33} In the second assignment of error, McNamara claims that his convictions are against the manifest weight of the evidence.

{¶34} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No.

92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541.  The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, has stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendants?  * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror'and disagrees with the factfinder's resolution of the conflicting testimony."  [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶35}** Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).  Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'"  *Id.*, quoting *Martin*.

**{¶36}** We note that when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible.  *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26; *see also State v. Lilliard*, 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, ¶ 93 (In considering the credibility of witnesses on a manifest weight challenge, an appellate court is "guided by the presumption" that the jury, or the trial

court in a bench trial, is "'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984)). Therefore, we afford great deference to the factfinder's determination of witness credibility. *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, ¶ 36.

{¶37} McNamara argues the trial court "lost its way" in determining that he inappropriately touched J.R., took and possessed a graphic photograph of J.R.'s vagina, and possessed nude images of underage girls. Specifically, he argues that major inconsistencies "cast a shadow" on the reliability of the witnesses's testimony. He claims that J.R. and her family members fabricated the story because G.R. and McNamara were having marital troubles. He also claims it is unreasonable to believe that McNamara raped J.R. while others may have been home because they could have walked in at any time. He also contends that J.R.'s testimony that she did not disclose the abuse to M.C. until eighth grade conflicts with M.C.'s testimony that the disclosure occurred in sixth grade. The state recognizes inconsistencies in the witnesses' testimony, but maintains that these minor inconsistencies were not material as to render McNamara's convictions against the manifest weight of the evidence. We agree.

{¶38} Minor inconsistencies in witness testimony will not render a conviction so against the manifest weight of the evidence as to cause a miscarriage of justice. *State v. Weems*, 8th Dist. Cuyahoga No. 102954, 2016-Ohio-701, ¶ 29-30. In the instant case,

there were some minor inconsistencies, but there were also several material consistent statements made by the witnesses. J.R., G.R., D.M., and K.G. all testified that they recognized an inappropriate relationship between J.R. and McNamara. There was also consistent testimony of multiple witnesses that there was a graphic photograph of J.R.'s vagina on McNamara's cell phone. This photograph was identified by J.R., G.R., D.M. and Detective Sheridan. There was consistent testimony from J.R., and G.R. that no one else was permitted to use McNamara's laptop, and that only McNamara was observed using his laptop. G.R. also testified that McNamara was protective over his cell phone.

{¶39} Moreover, there was no contradictory testimony as to when the rapes occurred. While there was an inconsistency of the dates in which J.R. spoke to M.C. about the abuse, it was clear that J.R. spoke to M.C. about McNamara's sexual abuse on more than one occasion.

{¶40} Here, the trial court observed the witnesses and their demeanor, gestures, and voice inflections and found McNamara guilty of illegal use of minor in nudity-oriented material or performance and possessing criminal tools. We afford great deference to the factfinder's determination of witness credibility. *Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, ¶ 36. As a result, we find that the convictions are not against the manifest weight of the evidence. We cannot say that the trial court lost its way and created a manifest injustice in convicting McNamara.

{¶41} Therefore, the second assignment of error is overruled.

{¶42} Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

MELODY J. STEWART, J., and
PATRICIA A. BLACKMON, J., CONCUR