[Cite as *State v. Gindlesperger*, 2017-Ohio-7478.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 104539

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RICHARD D. GINDLESPERGER, JR.

DEFENDANT-APPELLANT

---

### JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-594838-A

**BEFORE:**   Kilbane, P.J., Boyle, J., and Jones, J.

**RELEASED AND JOURNALIZED:**   September 7, 2017

**ATTORNEYS FOR APPELLANT**

Mark A. Stanton
Cuyahoga County Public Defender
Erika B. Cunliffe
Assistant Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Melissa Riley
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

**{¶1}** Defendant-appellant, Richard D. Gindlesperger, Jr. ("Gindlesperger"), appeals from his convictions for driving under the influence and failure to comply. For the reasons set forth below, we affirm.

**{¶2}** In April 2015, Gindlesperger was charged in a four-count indictment. Counts 1 and 3 charged him with driving while under influence ("DUI"). Counts 2 and 4 charged him with failure to comply.[1] The charges arise from a traffic stop initiated by Ohio State Highway Patrol Trooper Zachary Coleman ("Trooper Coleman") in March 2015.

**{¶3}** In January 2016, the matter proceeded to a jury trial, at which the following evidence was adduced.

**{¶4}** On March 18, 2015, Trooper Coleman was patrolling traffic on I-71 northbound near Strongsville, Ohio when he checked a passing vehicle's speed with his laser device at a rate of 76 m.p.h. in a 60 m.p.h. zone. Trooper Coleman pulled up behind the vehicle with his emergency lights activated. Trooper Coleman testified that he followed the vehicle for approximately a quarter mile before the vehicle pulled over to the east berm.

---

[1] Each DUI count carried a specification that Gindlesperger had been convicted of five or more equivalent offenses within the past twenty years. Each failure to comply count carried a furthermore specification. Count 2 specified that the operation of the vehicle caused a substantial risk of serious physical harm to persons or property. Count 4 specified that Gindlesperger fled after the commission of a felony.

**{¶5}** Trooper Coleman approached the vehicle from the passenger's side and made contact with the driver, later identified as Gindlesperger. Upon approaching the vehicle, Trooper Coleman asked Gindlesperger for his driver's license and insurance card. Gindlesperger replied that he did not "have it on him." Trooper Coleman testified to several observations he made while speaking with Gindlesperger. Trooper Coleman detected a strong odor of alcoholic beverage coming from inside the vehicle. He also noticed that Gindlesperger's eyes were bloodshot and glassy, as well as the fact that Gindlesperger seemed "extremely nervous" and was shaking really bad.

**{¶6}** Trooper Coleman testified that he is a graduate of the State Highway Patrol Academy, whose curriculum includes a 40-hour course on identification of impaired motorists and the administration of field sobriety tests. Trooper Coleman received further instruction on identifying impaired drivers through his participation in the State Highway Patrol Academy Drinking Lab, where he was able to observe test subjects under the influence of alcohol.

**{¶7}** Trooper Coleman further testified that based on his experience and training, factors such as the strong odor of alcohol, bloodshot, glassy eyes, nervousness, and speeding are often indicators of an impaired individual. Based on these indicators, Trooper Coleman asked Gindlesperger to exit his vehicle with the intention to administer field sobriety tests on Gindlesperger. Rather than complying with Trooper Coleman's request, Gindlesperger told Trooper Coleman that "he can't do it, he's sorry[.]" Gindlesperger then took off in his car at a high rate of speed. It took Trooper Coleman

approximately five seconds to return to his vehicle and commence pursuit of Gindlesperger. By this point, Coleman had nearly lost visual contact with the vehicle. Trooper Coleman testified that his patrol car reached speeds of 120 m.p.h. in an attempt to catch up to Gindlesperger. Trooper Coleman eventually lost complete visual contact with the vehicle and his supervisor terminated the pursuit for safety concerns.

{¶8} While pursuing Gindlesperger, Trooper Coleman testified he witnessed "large debris dust," that was caused by Gindlesperger when he nearly forced another vehicle off of I-71. After termination of the pursuit, Trooper Coleman discovered that the vehicle was registered to Gindlesperger's mother, Linda Hodolic ("Hodolic").

{¶9} The interaction was recorded on Trooper Coleman's dash-cam video and was played for the jury. In the video, Trooper Coleman is seen speaking to Gindlesperger, first from the passenger's side front window and then from the driver's side front window. While Trooper Coleman is speaking with Gindlesperger from the driver's window, Gindlesperger then takes off at a high rate of speed. Trooper Coleman then runs to his patrol car and the chase ensues. Trooper Coleman quickly lost sight of Gindlesperger because of the large cloud of dust.

{¶10} Another trooper traveled to the address linked to the license plate number and spoke with Hodolic. He spoke with her about the incident on I-71 and requested that Gindlesperger contact the State Highway Patrol to discuss the incident. He gave Hodolic Trooper Coleman's phone number. Trooper Coleman spoke with Gindlesperger the next day and advised that he come to the post to follow up on the traffic stop. Trooper

Coleman testified that Gindlesperger did not come to the patrol office until the next day, which was two days after the incident. Trooper Coleman did not issue a breathalyzer test at this point, because the two-day passage in time would not have led to reliable test results. While at the post, Gindlesperger asserted his *Miranda* rights and declined to answer Trooper Coleman's questions.

{¶11} Hodolic testified that she and Gindlesperger had spent March 18, 2015 mourning together, because the date fell near the birthday of Gindlesperger's deceased father, who had died six months prior in September 2014. The death of Gindlesperger's father occurred on the same day Gindlesperger's sister died in a car accident. Hodolic testified that she fell asleep around 5:30 p.m. and has no memory of any events until the trooper arrived at her home. With the trooper present, Hodolic called Gindlesperger's cellphone and alerted him to the fact that a trooper was at the house and wanted to speak with him. She testified that Gindlesperger did not return home until a couple of hours later. Two days later, Hodolic accompanied Gindlesperger to the Highway Patrol post.

{¶12} Gindlesperger and Hodolic both testified for the defense. Hodolic testified she suffers from chronic obstructive pulmonary disease ("COPD") and is allergic to mold. In order to reduce mold in her car, she uses a certain microbial spray, which smells like alcohol when freshly sprayed. Hodolic testified that the last time she used the compound in the car was "probably the day before" Gindlesperger was stopped by Trooper Coleman.

**{¶13}** Gindlesperger testified that he has a criminal history involving alcohol, but he stopped drinking the day his father and sister passed away in 2014. He denied consuming any alcohol on the day of the incident. He explained that on March 18, 2015, he and his mother spent the day reminiscing about their deceased family members and had a birthday party for Gindlesperger's deceased father. After his mother fell asleep, Gindlesperger testified that he sat in Hodolic's car because he wanted to listen to a CD of his father playing music. A few minutes later, Gindlesperger decided to take Hodolic's car and drive to his friend's house, which required Gindlesperger to traverse I-71.

**{¶14}** While traveling on northbound I-71, Gindlesperger described the flow of traffic as moderate. As Gindlesperger proceeded along I-71, he recalls driving at a speed of about 65 m.p.h. when he passed Trooper Coleman's parked car. After Gindlesperger came to a stop, Trooper Coleman walked over to the passenger's side and asked for Gindlesperger's license. Gindlesperger initially replied that he did not have it on his person. Trooper Coleman then approached the driver's side window of the car, where Gindlesperger subsequently revealed that he does not have a valid license. After this exchange, Gindlesperger testified that Coleman asked him to step out of the vehicle. Instead, Gindlesperger fled the traffic stop, stating to Trooper Coleman that "he can't do it, he's sorry[.]" He took off because he was thinking "about losing his mom's car[.]" Gindlesperger estimated that he drove for approximately a mile, never exceeding 75 m.p.h. before exiting the freeway. He sat on the side of the road for approximately an hour and a half until his girlfriend came and picked him up. While he was sitting in the

car, Hodolic called him and told him that a trooper was at the house looking for him. When his girlfriend arrived, they first went to a restaurant and then went back to his mother's house.

{¶15} When Gindlesperger called Trooper Coleman the next day, he explained that he was not able to come in that day, but that he could come in the next day. Trooper Coleman agreed to this request. When Gindlesperger met with Trooper Coleman the next day, he described the circumstances surrounding his relatives' deaths. He did not discuss the traffic stop because he wanted an attorney and did not want to waive his *Miranda* rights.

{¶16} At the end of the presentation of evidence, the state requested and received a "flight" jury instruction, which while not creating a presumption of guilt, allowed the jury to infer that Gindlesperger's act of fleeing the scene indicated a consciousness of guilt. The trial court allowed this instruction to be read to the jury despite defense counsel's objection.

{¶17} After jury deliberations, the jury returned guilty verdicts on all counts. At sentencing, the trial court merged Count 3 with Count 1 and Count 4 with Count 2. The state elected to proceed with sentencing on Counts 1 and 2. The court sentenced Gindlesperger to four years in prison on the prior DUI specification to be served consecutive to the two-year sentence on the underlying DUI charge on Count 1. The court also sentenced Gindlesperger to two years in prison on Count 2, to be served consecutive to Count 1, for an aggregate sentence of eight years in prison.

{¶18} Gindlesperger now appeals, raising the following three assignments of error for review.

## Assignment of Error One

[Gindlesperger] was deprived of his liberty without due process, because his convictions for driving under the influence are insufficient as a matter of law, and in any event, contrary to the weight of the evidence.

## Assignment of Error Two

The trial court violated the presumption of innocence and [Gindlesperger's] state and federal due process right to a fair trial when it improperly provided a flight or "consciousness of guilt" instruction.

## Assignment of Error Three

[Gindlesperger's] convictions on allegations in the furthermore clauses for failure to comply in [Counts 2 and 4] were against the weight of the evidence.

## Sufficiency and Manifest Weight of the Evidence

{¶19} In the first assignment of error, Gindlesperger argues his DUI convictions are insufficient as a matter of law and contrary to the manifest weight of the evidence. In the third assignment of error, Gindlesperger argues the convictions on the furthermore clauses in Counts 2 and 4 are against the manifest weight of the evidence.

{¶20} The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v.*

*Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶21}** We are mindful that, in considering the sufficiency of evidence, a certain perspective is required. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978). "This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.*, quoting *Atkins v. State*, 115 Ohio St. 542, 546, 155 N.E. 189 (1926). It is the minds of the jurors, rather than a reviewing court, that must be convinced. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

**{¶22}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a

judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶23} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

**{¶24}** We note that when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible. *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26; *see also State v. Lilliard*, 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, ¶ 93 (in considering the credibility of witnesses on a manifest weight challenge, an appellate court is "guided by the presumption" that the jury, or the trial court in a bench trial, is "'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984)). Therefore, we afford great deference to the factfinder's determination of witness credibility. *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, ¶ 36.

DUI Convictions

**{¶25}** In the instant case, Gindlesperger was convicted of two counts of driving under the influence in violation of R.C. 4511.19(A)(1)(a), which provides that: "[n]o person shall operate any vehicle * * * within this state, if, at the time of the operation * * *[t]he person is under the influence of alcohol, a drug of abuse, or a combination of them."

**{¶26}** Gindlesperger argues that while he has an extensive history of DUI offenses and left the scene when Trooper Coleman asked him to step out of his vehicle, the state

failed to present evidence that Gindlesperger was impaired. He maintains that without evidence of impairment, he cannot be convicted of DUI.

{¶27} We note courts have previously recognized that "'to prove impaired driving ability, the [s]tate can rely on physiological factors (*e.g.*, slurred speech, bloodshot eyes, odor of alcohol) and coordination tests (*e.g.*, field sobriety tests) to demonstrate that a person's physical and mental ability to drive is impaired.'" *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶ 12, quoting *State v. Wargo*, 11th Dist. Trumbull No. 96-T-5528, 1997 Ohio App. LEXIS 4846 (Oct. 31, 1997). Moreover, the case law is clear that circumstantial evidence and direct evidence inherently possess the same probative value. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492.

{¶28} Here, Trooper Coleman observed Gindlesperger driving his vehicle 16 miles over the speed limit on I-71. Trooper Coleman spoke with Gindlesperger and had the opportunity to make several observations of him. Trooper Coleman detected the strong odor of alcohol coming from inside the vehicle. Gindlesperger's eyes were bloodshot and glassy and Gindlesperger was extremely nervous. Based on Trooper Coleman's training, bloodshot and glassy eyes are an indicator of intoxication. Trooper Coleman asked Gindlesperger to step out of the car with the intention of having him perform field

sobriety tests. Instead of exiting his vehicle, Gindlesperger said "he can't do it, he's sorry" and drove off at a high rate of speed. Trooper Coleman pursued Gindlesperger at a speed of approximately 120 m.p.h., but was unable to catch up to Gindlesperger's car. The entire interaction was recorded on Trooper Coleman's dash-cam video. Gindlesperger then waited two days before meeting Trooper Coleman at the post about the incident. When viewing this evidence in a light most favorable to the state, any rational trier of fact could have found that Gindlesperger was impaired and was driving under the influence.

{¶29} Gindlesperger also argues that his DUI convictions are against the manifest weight of the evidence. Gindlesperger argues that because Hodolic offered an explanation for the smell of alcohol and both he and Hodolic testified that he no longer drinks, the state could not prove he was driving under the influence. We note that the jury was free to accept or reject any or all of the testimony of the witnesses and assess the credibility of those witnesses. Here, it is clear from the jury's verdict that they did not find Gindlesperger's and Hodolic's testimony to be credible.

{¶30} Hodolic testified that she used an alcohol-based spray in her car because of her COPD. However, Hodolic also testified that she never gave that information to the troopers and could not recall the exact day when her car was treated with the spray. While Gindlesperger testified that he no longer drinks, his actions during the incident and Trooper Coleman's observations indicate otherwise. Therefore, we cannot find that his DUI convictions are contrary to the manifest weight of the evidence.

{¶31} Accordingly, the first assignment of error is overruled.

Furthermore Clauses — Failure to Comply Convictions

{¶32} In the third assignment of error, Gindlesperger does not challenge the underlying failure to comply convictions in Counts 2 and 4; but rather, he argues his convictions on the furthermore clauses are against the manifest weight of the evidence.

{¶33} The furthermore clause in Count 2 provides that "the operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." The furthermore clause in Count 4 provides that "the offender was fleeing immediately after the commission of the felony."

{¶34} Gindlesperger argues that Trooper Coleman's testimony is suspect because he testified to only driving 75 m.p.h., and there was no record of Gindlesperger causing another vehicle off of I-71. The jury, however, had the opportunity to observe both Gindlesperger and Trooper Coleman and determined that Trooper Coleman's testimony was more credible. In addition to Trooper Coleman's testimony, the jury had the opportunity to observe Gindlesperger's flight from Trooper Coleman and how Trooper Coleman ran back to his car and engaged in a high-speed pursuit. Trooper Coleman testified that a car was nearly run off the road by Gindlesperger, causing large debris dust. This large dust cloud is seen in the video. Based on the foregoing, we do not find that the furthermore clause convictions are against the manifest weight of the evidence. We cannot say that the jury lost its way and created a manifest injustice in convicting Gindlesperger.

**{¶35}** Therefore, the third assignment of error is overruled.

<u>"Flight" or Consciousness of Guilt Jury Instruction</u>

**{¶36}** In the second assignment of error, Gindlesperger argues that the flight instruction was improper because it allowed the jury to infer that he committed a DUI despite there being no evidence of impairment.

**{¶37}** In its instructions to the jury at the close of trial, the trial court, over Gindlesperger's objection, stated to the jury that testimony had been admitted indicating that Gindlesperger fled the scene and that, although evidence of flight did not raise a presumption of guilt, the jury could consider evidence of flight as indicating Gindlesperger's "consciousness of guilt."

**{¶38}** This court has previously held that "[f]light from justice may be indicative of a consciousness of guilt." *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, citing *State v. Taylor*, 78 Ohio St.3d 15, 27, 1997-Ohio-243, 676 N.E.2d 82. Flight "means some escape or affirmative attempt to avoid apprehension." *State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19. "Flight is more than merely leaving the scene of a crime — it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 28, citing *Santiago* at ¶ 30. The trial court has discretion to decide whether to issue an instruction on flight. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 48. A trial court does not abuse its discretion by

issuing an instruction on flight if sufficient evidence exists in the record to support the charge. *Id.* at ¶ 49.

**{¶39}** The state argues that a flight instruction was appropriate based on Trooper Coleman's testimony as well as Gindlesperger's testimony. Gindlesperger testified that he fled from Trooper Coleman and stayed in his car for approximately an hour and a half until his girlfriend came to pick him up. During that time, he spoke to Hodolic who told him that the troopers were at his house looking for him.

**{¶40}** Based on this evidence, we find the trial court did not abuse its discretion by instructing the jury that it may infer that such circumstances show that Gindlesperger avoided Trooper Coleman because he knew he was guilty and wished to avoid the inevitable consequences of his crime.

**{¶41}** Accordingly, the second assignment of error is overruled.

**{¶42}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

MARY J. BOYLE, J., and
LARRY A. JONES, SR., J., CONCUR